[L. A. No. 5012. Department Two.—August 15, 1917.]

## Estate of THOMAS B. EMERSON, Deceased.

ESTATES OF DECEASED PERSONS—EXECUTORS AND ADMINISTRATORS—ACCOUNT OF SPECIAL ADMINISTRATOR.—Traveling expenses to procure appointment of special administrator are not allowable; nor are traveling expenses going to another state to draw money from banks allowable under the circumstances shown.

ID.—ACCOUNTING BY SPECIAL ADMINISTRATOR—EVIDENCE—DEBT DUE BY SPECIAL ADMINISTRATOR TO ESTATE.—Uncorroborated testimony by a special administrator of an oral agreement of settlement with the decedent, if admissible at all, is in its nature the weakest and most unsatisfactory, and should be received with extreme caution.

ID.—EVIDENCE—COUNTERCLAIM BY ADMINISTRATOR—ADMINISTRATOR'S TESTIMONY INADMISSIBLE.—An administrator who asserts a counterclaim to offset a claim held by the decedent's estate is precluded by subdivision 3 of section 1880 of the Code of Civil Procedure, from being a witness as to any matter of fact occurring before the death of the decedent.

APPEAL by administratrix from decree of Superior Court of Los Angeles County settling account of special administrator. James C. Rives, Judge.

The facts are stated in the opinion of the court.

James W. Miller, John E. Carson, and Hanson, Hackler & Heath, for Appellants.

Irwin, Smith & Rosecrans, and Fred N. Arnoldy, for Respondent.

HENSHAW, J.—This is an appeal from an order and decree of the court in probate settling the first and final account of Collins P. Emerson, special administrator of the estate of Thomas B. Emerson, deceased. Thomas B. Emerson died intestate, a resident of the county of Los Angeles. Collins P. Emerson is his brother. He came from Iowa to California, applied for and received letters of special administration upon the estate of the deceased. He qualified and acted. Thereafter he sought, under section 1339 of the Code of Civil Procedure, to procure the probate of a will of his brother which

he averred was destroyed after his death. Failing in this he moved for a new trial, and appealed from the order denying it. This appeal is considered in *Estate of Emerson*, 170 Cal. 81, [148 Pac. 523]. For the present purpose it is sufficient to say that he produced a writing which he asserted was a copy of this destroyed will. His testimony concerning it was thoroughly discredited, and it is perhaps unnecessary to add that by its terms he was a beneficiary of his brother's bounty to the extent of one-third of his estate. The widow of Thomas B. Emerson, deceased, then applied for general letters of administration and her application was opposed by this special administrator, who also petitioned for general letters. The widow received the appointment and the special administrator filed his first and final account of his special administration of the affairs of the estate.

The account as first presented set forth the amounts of money belonging to the estate of his brother which he had drawn from several banks, and it is noteworthy that in each instance he failed to report the amounts over the face of these bank accounts, which he had received from the banks by way of interest in addition to the principal sums. He only did so after his account as first presented was attacked for these as well as for other reasons. His explanation as to why he had failed to charge himself with these additional moneys thus received as interest may be given in his own language. "I charged myself with $1,575.68 from the City National Bank of Clinton, Iowa. That was not the exact amount which I withdrew from that bank. There was $1,912.88. I left out the interest in my account. I do not know why I did not charge myself with it. I received the money."

Upon filing his revised or amended account these interest charges were of course included, and they were all allowed but one, for the sum of $48.04, which unquestionably and admittedly he received by way of interest upon his intestate's account in the German-American Trust & Savings Bank. Respondent, indeed, admits that the failure of the court to charge the special administrator with this amount was due to oversight, and, this being recognized, we may pass on to certain other minor items before we come to a consideration of the principal sum in controversy. These minor items are two. The special administrator claimed, and the court allowed him, a credit of $116.13 for railroad fare and expenses

in his journey from Cedar Rapids, Iowa, where he lived, to California, made for the purpose of applying for letters of special administration. The expense was incurred before he was appointed and for the purpose of procuring the appointment. Had the services of the special administrator proved even of great value to the estate—and here quite the reverse is true—this would not have been an allowable item. This was expressly decided in *Estate of Byrne,* 122 Cal. 260, [54 Pac. 957, 1015], and the item should therefore have been disallowed.

The second minor item, also allowed by the court, is for $143.36 for railroad fare and expenses incurred by the special administrator in going from Los Angeles to Cedar Rapids to withdraw the moneys belonging to the estate on deposit in banks at Cedar Rapids, Iowa, and at Clinton, Iowa. Not one word is shown as to the necessity for this trip. It is plainly inferable, the special administrator having personal interests of his own in Iowa, that the trip was made in furtherance of those interests, and the benefit of the estate was made an excuse therefor. But aside from this, it is beyond controversy that everything which the administrator did, he could have done by requests upon these banks to transfer these deposits upon forwarding to them certified letters showing his authority in the matter of the estate, and such, as this court is well advised, is the usual practice of prudent administrators. To bolster up this claim the administrator testifies that on this trip "I succeeded in getting $257.25 as interest from the bank. I also succeeded in finding a contract on some property that my brother owned, which I formerly owned and sold him, and afterward I sold it for him and the contract had not been fulfilled; the payments had not been made, and the balance on that payment was $495. That contract I got." The remainder of his evidence dealt with inconclusive journeys and inquiries which he made, prompted, as he says, "for the reason that there was a large shrinkage in my brother's estate that he was reputed to be worth." It strains credulity to believe that he succeeded in getting $257.25 as interest from the bank because the president was his "personal friend," and not because it was interest due on the deposit. It would require more convincing evidence to lead us to believe that the president of a national bank thus juggled with and illegally dissipated its depositors' funds. But it

is quite noteworthy in this connection to observe that this $257.25 interest which he thus secured as fruits of his journey east was a part of the money which he did not account for, which he would have retained if his first account had not been attacked, and which, upon attack, he admitted belonged to the estate. And finally, whatever may have been the eastern shrinkage in the value of his brother's estate, it suffered a very marked and decided shrinkage at the special administrator's own hands in California, as we shall see when we pass on to the next item.

The heirs of the deceased sought to charge this special administrator with nine thousand dollars, admitted by him to have been borrowed from his brother shortly before that brother's death. The special administrator sought to relieve himself from this, not under any denial of the receipt of these moneys, which he admitted, but by his own unsupported testimony that after having received these moneys there was a business settlement of his affairs with his brother, who was and for a long time had been owing him money, under which settlement the nine thousand dollars was accepted by him in payment of all his demands against his brother, so that at the time of his brother's death neither stood indebted to the other in any sum whatsoever. This unsupported evidence of an oral agreement, made in the presence of nobody and evidenced by no writing, the court accepted to the fullest extent and ruled accordingly. It did this, we regret to state, in violation of positive law and against the overwhelming weight of the counter-showing.

This subject matter, as indicated, falls under two heads: First, the weight of the evidence itself, assuming its admissibility; and, second, the question of its admissibility. First as to the weight of evidence. Preliminarily it is to be noted that the evidence is self-serving in that it exonerates the witness giving it from a liability to the estate of his deceased brother in the sum of nine thousand dollars with interest, which liability, saving for his own testimony, is fixed against him. Second, the evidence is of oral admissions against interest by a man whose lips are sealed in death. What, then, does the law say of such evidence (assuming now its admissibility)? The Code of Civil Procedure declares (section 2061, subdivision 4) that "the evidence of oral admissions of a party ought to be received with caution by the jury." In

*Mattingly* v. *Pennie,* 105 Cal. 514, [45 Am. St. Rep. 87, 39 Pac. 200], this court in Bank said, "No weaker kind of testimony could be produced." Again in Bank (*Austin* v. *Wilcoxson,* 149 Cal. 24, [84 Pac. 417]) this court has said: "It is not stating it too strongly to say that evidence so given under such circumstances must appear to any court to be in its nature the weakest and most unsatisfactory." Says Lord Romilly, Master of the Rolls, in *Crouch* v. *Hooper,* 16 Beav. 182: "It is always necessary to remember that in these cases, from the nature of the evidence given, it is not subject to any worldly sanction, it being obviously impossible that any witness should be convicted of perjury for speaking of what he remembers to have been said in a conversation with a deceased person." Therefore, proceeds the learned judge, he has never experienced any difficulty in rejecting and disregarding such evidence. And, as Vice-Chancellor Van Fleet of New Jersey said (*Lehigh Coal & Nav. Co.* v. *Central R. R. Co.,* 41 N. J. Eq. 167, [3 Atl. 134]), speaking of such witnesses as this special administrator: "It is obvious that their position in the case makes it the duty of the court to examine their testimony with a jealous care and to scan it with a watchful scrutiny. They are masters of the situation and swear without fear of contradiction. . . . The safe administration of justice demands that in such a case there should be either satisfactory corroborative evidence, or that the evidence of the living party should be so full and convincing as to persuade the court of its entire truth." And, finally, the text-writers show that the courts are all in accord in thus weighing such evidence, and here suffice it to cite 2 Moore on Facts, secs. 877, 1150 and 1166; 1 Taylor on Evidence, sec. 648; Wigmore on Evidence, secs. 578, 2065.

What, then, is the evidence of the special administrator, and what is the weight to be accorded to it under these well-settled rules? In its essence it was that as a result of business transactions had with his brother in 1870, his brother owed him two thousand eight hundred dollars. "My brother was owing me from a transaction dated back in 1870." As to this transaction he and his brother never had a settlement, and this principal sum with accrued interest formed the basis of the claim which he put forth in his account, and the basis of the oral settlement which he says he had with his brother just previous to the latter's death. Second, he conveyed to

his brother farming lands for five thousand eight hundred dollars for a debt owed by him to his brother. This conveyance was made subject to an oral agreement with his brother, whereunder his brother promised when he sold these lands to restore to this administrator all over the amount of five thousand eight hundred dollars which he might receive therefor. Third, in some elusive and not wholly comprehensible way, he owned a half interest in a bank, which nominally his brother owned, and which his brother had sold at a profit. So much for the special administrator's evidence in outline. Upon the other hand, it was shown by the records of the deceased, by letters in the voluminous correspondence which had passed between the two, that this administrator was and for long years had been a most persistent and importunate beggar and borrower of moneys from his brother, evidencing in many instances his debts to his brother by his promissory notes; that from time to time his brother forgave him these debts and returned the notes with no dollar of principal or interest paid thereon, in one instance the amount of the notes so returned with interest easily amounting to ten thousand dollars. This administrator testifies that he paid every dollar of those notes, but upon examination it appears that he meant that he paid them because they were canceled against this vague indebtedness existing since 1870, and even as to that indebtedness, originating, as he says in 1870, and resting for its authenticity solely upon the testimony of this witness, when asked, "Your brother owed you at that time [1870]?" he replied, "No, he owed me,—yes, sir, practically owed me two thousand eight hundred dollars." And elsewhere he declares that his brother's "indebtedness arose in 1874 in the sum of two thousand eight hundred dollars." It has been said that during all of these thirty-five or forty years he was a persistent and importunate borrower from his brother. The evidence is abundant that his brother forgave him these debts. There is not the slightest evidence that he ever paid any of them, saying as he said he paid them by canceling them against his brother's indebtedness to him. Not only do his letters abundantly bear this out, but he testifies that he borrowed from his brother "hundreds of times," though elsewhere he declares in flat contradiction to this statement that "it is not a fact that I was a constant borrower from my brother up to his death." But more significant than this is the circum-

stance that his letters, covering all of these years, requesting and even begging his brother to lend him money, speaking of his financial difficulties and the importunate demands of his creditors, never in one instance (saving as hereinafter will be noted) contained the slightest claim, reference, or suggestion that his brother owed him anything, and when interrogated upon this the record shows the following: "If your brother was owing you at that time, why did you not say something to him about his indebtedness? A. Well, that is a matter which we have always left unsettled." Moreover, repeatedly in his letters to his deceased brother are found such expressions as this from one of them: "I trust that I may be spared in health to fully pay you every cent with interest that I owe you." "I hope to be in shape to return, before 1910 rolls round, a portion of these loans." The one instance, to which reference has just been made, is the following: The special administrator testified that in the spring of 1911 he did write to his brother, suggesting a settlement of this long-standing open account between them, and formal demand is made upon the administratrix and heirs to produce this letter which the witness says he mailed to his brother and to which he asserts he received a reply. The response by the contestants is that they had no such letter. Then the special administrator produced a carbon copy of it, which was admitted in evidence.

Here it may not be amiss to remember that he produced a similar copy of the destroyed will of his brother, by which he was devised one-third of the estate. This letter is as follows:

"Now, Brother Bent, I think that we should get our matters fixed up and know where we stand in event that we should meet with some misfortune. We should fix the Seville sale which you made up, as the matter has never been settled. You have the books and know the amount which was credited on them just before we closed out the bank. I think that the notes which you have and also Collins' paper should be cancelled and returned to me and credited on this account, which would leave a balance due me on the deal. You also have some notes which belong to me and which you hold the security for."

What the special administrator says was the reply to that letter is here given:

"Los Angeles, Cal., May 2, 1911.
"Bro. Coll—

"If I am as well as I am now will start for Cedar Rapids about the 15th and as we are all liable to meet with accidents so we should be prepared to a certain extent, so you will find your notes enclosed which I have cancelled and paid in full. I shall also cancel the other note of $3896.00 that is in safety box in bank; also the one against Collins P. Emerson, Jr., paid. Hope weather will be settled by the time I get there. May this find you all well, and don't worry about me, as I am far from being on my last legs.

"BENTON."

It is most significant that this so-called reply makes no reference to the letter requesting a settlement, makes no reference to a settlement, and upon the face of it is but another example of the dead brother's generosity in forgiving the special administrator's debts and returning to him the evidences of them. But in addition to the fact that the notes thus returned with interest upon them certainly equaled ten thousand dollars, we find the witness still importuning his brother to lend him money, and never intimating that the moneys which he received and hoped to receive are anything other than loans. Thus on December 30, 1912, after he has begged his brother to lend him money his brother sends him eight thousand dollars "to square him up," and asks him whether this will be sufficient. In reply the witness writes an effusive letter of thanks, and continues: "Now you ask me the question whether the amount sent [$8000] was sufficient to square up. In reply would say that I could use five hundred more, but I am ashamed to ask it. That would place me out of the clutches of every individual and leave my indebtedness entirely with you." Upon this he is sent another thousand dollars, and these two sums make up the nine thousand dollars in controversy.

It has been said that while the administrator's claim is based upon an indebtedness of two thousand eight hundred dollars, which he asserts was owing to him by his brother in 1870, and which with accrued interest compounded he further says makes up the indefinite amount which he declares his brother owed him, he also testified to a land transaction whereby his brother took over the title to a farm which the witness owned, for five thousand eight hundred dollars, agree-

ing to pay him when he disposed of the farm the difference between five thousand eight hundred dollars and the selling price; that his brother sold the farm for something like nine thousand dollars, which left about three thousand dollars due to the witness. Here again it is noteworthy that while he testifies that he never had a settlement with his brother over the two thousand eight hundred dollars, he did make over this farm to him "for the sum of five thousand eight hundred dollars in some of our settlements." Elsewhere he testifies that his deceased brother did not pay him for the farm "except in the way I owed him and turned the farm over to him for what I was owing to him. I deeded the farm to him in partial payment for what I was owing to him." Therefore this transaction, too, had its origin in a debt due from the witness to his deceased brother. The nature of the transaction, according to the special administrator's testimony, has been sufficiently indicated. The agreement, if there were an agreement, was oral. It was entered into in 1904 and the deceased brother, who thus took the title to the ranch, sold it for eight thousand six hundred dollars, taking a mortgage for seven thousand eight hundred dollars on account of the purchase price. The interest on this mortgage, it appears indisputably, was year by year turned over to this witness, not as his due, but as loans from his brother, who annually took the witness' promissory note for $429 for several years, this sum representing the interest upon the mortgage. In the end the deceased gave back to his brother these canceled notes without payment thereon. It was not until September 20, 1912, that, after foreclosure of this mortgage for seven thousand eight hundred dollars, the deceased received through his attorney in Iowa $9,078.65, which was deposited to his credit in an Iowa bank. It was nine thousand dollars of this money which the special administrator secured as a loan and which is the amount here in controversy. It is the difference between this five thousand eight hundred dollars and this nine thousand dollars which he says was his. But this witness was with his brother after the proceeds of the foreclosure had been placed to the latter's credit, and there was introduced in evidence a statement which the special administrator admitted was in his deceased brother's handwriting. That statement showed, "Paid C. P. E. (Collins P. Emerson) for farm $8500," instead of five thousand eight hundred dollars.

It showed the proceeds from the farm and the expenditures on account thereof; in short, it was a complete statement of profit and loss in connection with the purchase, and it showed a loss to the deceased, which by his statement he threw off, of $1,039.70, and in the deceased's own handwriting it finally bore the declaration, "Settlement between C. P. and T. B. E." Notwithstanding the witness' denial that there had been such settlement, it will not be denied that the statement has evidentiary value.

The third element of indebtedness lies in the fact that the deceased brother purchased an interest in a bank in Miles, Iowa, and was for a time in partnership with Mr. Miles, the original owner of the bank. In time Mr. Miles sold his interest to Thomas B. Emerson for about twelve thousand dollars, the bill of sale of all that interest running to Thomas B. Emerson, with no reference whatsoever to Collins. Notwithstanding the fact that this special administrator's account charges upon an unsettled indebtedness due to his brother from him in 1870, which had increased by 1874 to two thousand eight hundred dollars, his evidence upon these matters is that he was a secret partner with his brother in this purchase and that his money, this two thousand eight hundred dollars, was a part of the purchase. Even more than that, he says that when his brother came to buy out Mr. Miles for twenty-five thousand dollars (though the purchase price declared in the bill of sale and transfer from Miles was about twelve thousand dollars) he took his payment of one-half of the twenty-five thousand dollars—twelve thousand dollars— in a valise and gave it to his brother. Here again the writings of the brother are in flat contradiction to the statement. Thus he writes to his brother:

"Bro. Coll. How will you be fixed for money about the first of March? I may need a little. I shall make Mr. Miles a proposition when we come to settle up, to give or take. Don't think he will sell, but should he do so will want to pay him every cent and I might want $10,000, *at least what is coming to me.*"

Later he writes to his brother to the same effect, saying that he will not want to exceed three thousand dollars, but asking him to be prepared to let him have that should necessity require it, and he adds, "Smith wrote me saying he would loan me $3,000, but I don't want to borrow." Thus it ap-

pears that the debt founded upon the interest in the bank is quite as shadowy and unsubstantial as that asserted to be founded upon the sale of the farm.

This review of the evidence serves to establish the nature of the claims and demands which the special administrator declared existed against his brother and which form the basis of the settlement of their open account, dating back to 1870.

What, then, was that settlement? The evidence of it is the wholly uncorroborated testimony of a conversation had with his brother when the latter was on his deathbed. The special administrator gives two versions of this oral settlement had with his brother by which his admitted debt of nine thousand dollars was extinguished. He was present at his brother's house in Los Angeles when that brother was in bed with his last illness. While there the latter's "wife went down town, and while she was gone we had an opportunity of talking our matters over, and I said to him, 'Benton, how will we arrange for this money you have let me have?' He said, 'I owe you on the Estherville land deal a little over three thousand dollars. I have paid to you, turned over to you in May when I was in Cedar Rapids, your notes, which was applied upon my account, and together with this six thousand dollars, will wipe out what I owe you and what you owe me.' He says, 'Is that satisfactory?' I says, 'Entirely so.' '' Some weeks after, testifying again, he gives the following version: "I said to him, 'How do you want this matter fixed that we have, this money that you have let me have?' I said, 'Do you want me to give a note?' He said, 'No, you don't need to give me any note.' He said, 'I owe you on the Seville Manufacturing matter and I owe you on the Estherville farm and what you owe me on the nine thousand dollars one should offset the other.' He had turned me over some notes on May 11, 1903, and he said, 'Is that satisfactory?' and I said it was.'' The "Seville Manufacturing matter" is the asserted original two thousand eight hundred dollars indebtedness which we have heretofore considered. The "Estherville land deal'' involves the asserted debt of three thousand dollars due from the deceased to this plaintiff which, as before shown, is wholly disproved by the deceased's own records, as is the evasive testimony of the special administrator concerning his interest in the bank. A slight, but unnecessary, computation, moreover, would show that, treating the two thousand

eight hundred dollars as a debt existing and continuing to exist since 1870, and compounding interest upon it, the total amount would not equal the moneys, aside from the nine thousand dollars, which this special administrator had received from his brother, which moneys were clearly gifts, though described by the special administrator as being par‑tial settlements of their affairs. But this is by no means all. After his brother's death he made out to and in his brother's name his promissory note for six thousand dollars, apparently upon the theory that he might be able to cancel the remaining three thousand dollars of the nine thousand dollars indebtedness by his testimony of his deceased brother's indebtedness to him in the sum of three thousand dollars on the "Estherville farm deal." He not only writes this note and hands it to the widow, but enters it as an asset of the estate, and only upon the settlement of his account does he seek to avoid its legal effect by this showing previously considered of the settlement with his brother, accompanied by the following extraordinary explanation of the reasons for which he gave the note. His brother was dead; the widow brought to him a large envelope containing a number of his papers; it contained notes, and he sat down and proceeded to make a list of them. The widow left the room and returned. "She had a blank note with her, and she says, 'This is six thousand dollars,' and I started in to make it up, and after reading the account—to make it in ten years without interest. Of course, I supposed it would be settled at any time, and I started in to make it, and she said, 'No,' she said, 'don't make it that way.' She was crying, feeling bad, and I turned around and made it payable when the Benton county farm was sold. That is the history of the note." This note he handed to the widow.

This is all the explanation offered for his execution and acknowledgment of an indebtedness of at least six thousand dollars, made without the slightest pressure or coercion, and made immediately after he testifies there had been a complete settlement with his brother, under which he owed his brother nothing—a settlement which itself was made neither in the presence nor with the knowledge of any other person.

The testimony of this special administrator stands alone. It is not corroborated in the slightest particular, for the testimony of his wife to the effect that she, too, understood that

her husband was to have all the sale price of the farm over five thousand eight hundred dollars is negligible, and on the face of this record it is plain that this evidence is inherently improbable, and is as thoroughly discredited as it is discreditable.

The second consideration touching the admissibility of the evidence requires but brief consideration. Subdivision 3, section 1880, of the Code of Civil Procedure in terms forbids the admission of evidence in any proceeding against an executor or administrator upon a claim or demand against the estate of a deceased person as to any matter or fact occurring before the death of such deceased person. Eliminating from consideration for the moment the fact that the man who was admittedly debtor to the estate in the sum of nine thousand dollars happened also to be its special administrator, apart from that relationship the case presented is an admitted claim due to the estate, the validity of which the debtor seeks to destroy by a showing of an oral settlement and extinguishment of that claim. The theory of respondent, adopted by the court, is that the special administrator was not, within the meaning of the statute, seeking to enforce a claim against the estate, but was merely resisting a claim made by the estate against himself. Such is entirely too narrow a construction to be given of the statute. His method of resistance is to assert a counterclaim, and the mere fact that he is satisfied to ask for a cancellation of his indebtedness without asserting a right to recovery under this settlement in no wise militates against the fact that his evidence is essentially the evidence of a counterclaim. He declares that he had such a counterclaim; his account shows that it was a counterclaim upon a debt of two thousand eight hundred dollars arising in 1870, and with the lips of his brother sealed by death he is permitted to testify to a settlement exonerating him from liability upon a claim barred for years by the statute of limitations. This case in principle is controlled by *Moore* v. *Schofield,* 96 Cal. 486, [31 Pac. 532], and *Stuart* v. *Lord,* 138 Cal. 672, [72 Pac. 142]. It appears, therefore, that the court in probate erred as seriously in admitting the evidence as it did in giving weight to it, and for both reasons the decree appealed from is reversed, with instructions to the court in probate to disallow the contested items and to charge the special administrator with the amounts of them.

Lorigan, J., and Melvin, J., concurred.