[Civ. No. 13740.   First Dist., Div. One.   Oct. 28, 1948.]

JOHN A: HODGES, as Executor, etc., Appellant, v. NICK PORIKOS et al., Respondents.

Chas. N. Douglas for Appellant.

Melvin, Faulkner, Sheehan & Wiseman and A. J. Zirpoli for Respondents.

BRAY, J.—Plaintiff appeals from a judgment in favor of defendant.

There are two causes of action. In the first, plaintiff, who is the executor of the will of James A. Nicholson, deceased, alleged that on or about February 24, 1945, defendant borrowed $10,000 from the deceased, which he failed to pay on demand. The second cause of action alleges that on or about the same date defendant received from the deceased $10,000

for the purpose of investing it in certain real property, to be held in the name of defendant but for the use and benefit of decedent. No evidence was introduced under the second cause of action and a nonsuit was granted as to it. In the findings, the court found against plaintiff on both causes of action. No attack is made, or could be made, on the court's ruling on the second cause of action.

The sole question raised is whether there is substantial evidence to support the judgment as to the first cause of action. Plaintiff recognizes the rule that binds this court on a contention that the evidence does not support the judgment,[1] but contends that the defendant's evidence in this case was so incredible, contradictory and obviously false as not to measure up to the standard of being *substantial* evidence.

In view of this challenge, a résumé of the evidence is necessary. The case arises from the fact that among the effects of the decedent a cancelled check for $10,000, dated February 24, 1945, was found, executed by him to defendant less than three months prior to death.

Plaintiff testified that the day after decedent died, defendant, who lived in Fairfield, came to a mortuary in San Francisco. There, he showed plaintiff two cancelled checks executed by defendant to decedent and totaling about $8,000 and stated that without those checks he would "have been in a hell of a fix" as people were saying defendant had borrowed $10,000 from decedent and had not paid it back. (It was conceded later that these checks were in repayment in 1944 of a loan theretofore made defendant by decedent.) Shortly thereafter plaintiff found the above mentioned check. About a month after the decedent died, defendant came to plaintiff's office with one Jensen. Plaintiff was under the impression that the $10,000 check was given to defendant to purchase certain property for decedent. This defendant denied. Plaintiff then intimated that decedent had loaned defendant the $10,000 evidenced by the check. This also defendant denied, and then stated that the check was given for money which defendant had loaned decedent. Plaintiff then asked defendant where he got the money. After first asking plaintiff "do I have to make a statement, do I have to prove it?" and being told that he did, he claimed he made the money gambling some time in the month of January, and that he had kept the money in his

[1]Where there is a conflict of the evidence the appellate court is bound by the findings of the trial court if there is any substantial evidence to support them. (*Rutherford* v. *Berick*, 82 Cal.App.2d 331 [186 P.2d 23].)

pocket from the time he made it until he gave it to decedent. When told that plaintiff did not believe that story, defendant then stated that he had made it in his business (a restaurant in Fairfield), and that he had told the gambling story as he did not report this money in his income tax report. Defendant then signed a statement that a few days before the check was cashed (March 1st) he had given decedent $10,000 at the Derby Café in currency of $20 and $100 denominations, for which decedent gave him a postdated check.

Decedent was the owner of the Derby Café and had six different bank accounts. The check in question here was drawn on the Day and Night Branch of the Bank of America. From February 21, to February 26, the amount in that account was only $2,979.59. February 24, the date of the check, was a Saturday. On Monday, February 26, evidently for the purpose of meeting this check, deceased added to the moneys then in that account, currency of $1,725, a check for $4,000, which he drew on his account with the Morris Plan, a check for $250 on the Anglo California Bank, a check for $257.60 on the Humboldt Branch of the Bank of America, and a check for $25.38 on the Central Bank of Oakland. Although there is some discrepancy in the amounts as shown in the transcript, it is conceded that the total actually in the bank when the check was presented was over $10,000. The cashing of the $10,000 check by defendant on March 1 reduced the Day and Night Branch account to a small balance. Subsequent to the time when defendant claimed he gave decedent $10,000 in cash, there are no entries in any of decedent's bank accounts which reflect any portion of that sum, nor was there any currency in the decedent's safe deposit box, other than a sum less than $100.

Plaintiff cross-examined defendant briefly under section 2055, Code of Civil Procedure, concerning matters occurring in 1944 and 1945, and relating to the checks which he claimed defendant exhibited to him at the mortuary. Jensen, the only other witness called by plaintiff, merely testified that at the meeting in plaintiff's office, defendant ''changed his mind about where the money had come from.'' Thus, in plaintiff's case, there was no evidence that the $10,000 check was given as a loan. At most the evidence showed that defendant on March 1 had cashed a $10,000 check issued to him by decedent; that defendant had told plaintiff different versions of how he had obtained the money which he claimed he gave decedent for the check; and that as executor plaintiff had

been unable to trace any portion of the $10,000 in currency which defendant claimed he gave decedent. Shortly after the date of the check, decedent, whose health was not good, had gone to the hospital for a period, and then on April 30 returned, dying there on May 8.

Defendant took the stand in his own behalf. He told the circumstances of a loan of $8,100 made to him by the decedent for the purchase of the restaurant at Fairfield, now owned by defendant, and the repayment of that loan by the checks which plaintiff claimed defendant exhibited to him at the mortuary, a transaction with which plaintiff was fully familiar as he acted as attorney in it. Defendant also testified concerning another financial transaction between himself and decedent in 1944. Then he stated that a few days before February 24, 1945, his wife and he came to San Francisco and went to the Derby Café where they had lunch and a few drinks. While sitting in the cocktail lounge, he gave decedent $10,000, receiving the latter's check therefor. Five thousand dollars was in his purse and a like sum in his wife's purse. The check was post-dated four or five days, or a week. Defendant held the check for several days, when decedent telephoned him and asked that he put the check through the bank, which defendant then did. Defendant admitted telling plaintiff in his office that he had obtained the $10,000 through gambling, because he didn't think it was plaintiff's or anybody's business how he happened to have that much cash in his hands. He also admitted telling plaintiff that he had not made a proper income tax accounting of this money, and that he had signed the statement testified to by plaintiff. He then stated that there was $9,000 in $100 bills; one $500 bill, one $50 bill and one $10 bill and that the balance was in $20 bills. (The signed statement merely referred to $20 and $100 bills.) He admitted seeing plaintiff at the mortuary, but could not remember whether he had talked to him.

Mrs. Porikos, defendant's wife, stated that they were at the Derby Café on a Thursday in February and told about the same story as her husband. In a little more detail, she stated they had all been drinking and she wanted her husband to give the money to decedent as she didn't think it was safe for them to carry it, and defendant gave decedent the $10,000 and received the check in return.

The witness Demetreades had known decedent since 1939; Porikos only a few years. Witness patronized the Derby Café almost daily and one evening when he went there to get the

decedent to go to a movie with him, he went into the small room, now the cocktail lounge, and saw defendant and his wife and the decedent seated at a table counting money. There were a number of hundred dollar bills—the exact number he didn't know, but more than ten. He then went out to sit in the café with Mr. Agnost, the partner of the decedent. About half an hour later, decedent, with defendant and defendant's wife, came out of the room where the witness had seen him, with paper money in his hands and went into his private office. When decedent emerged from his private office he had a check in his hands and said to the witness that he would not "see you to-night, but I can see you to-morrow morning." The following day decedent told the witness that defendant was "over-indulging" and that decedent "got from him $10,000."

James Levas, an apartment house owner, testified that in the first part of 1945, defendant came to his place in Alameda to put up a deposit on the purchase of an apartment house from him. Defendant had telephoned, asking the price of witness's equity and was told it was $35,000. Defendant stated he would be down Thursday with the money. Witness said it was not necessary to bring all the money; that "a little deposit" would do. Defendant and his wife arrived Thursday morning and then it developed that defendant had misunderstood witness as to the price, thinking witness had said "$25,000." At that time defendant pulled out a roll of bills, offering to make a deposit if witness would sell his equity for $25,000. Witness could not testify how much was in the roll, but the bills were "quite a bit" in number and he saw quite a few $100 bills.

Peter Agnost, who was the partner of the decedent in the Derby Café from the day it opened until the death of decedent, testified that shortly after the decedent returned from the hospital in February, witness saw decedent, defendant and his wife in the cocktail lounge. They were counting paper money. Witness asked decedent why he borrowed money from defendant and didn't use the partnership money in the bank. Decedent replied: "Porikos don't owe me any money, I don't owe Porikos any money, . . . But they had the money in their hands and they gave him the check in order to protect them from losing the money." At a subsequent date witness called defendant at Fairfield to ask him to buy some meat. Decedent then took the telephone and said to defendant: "Nick, you can put that check through, it won't bounce back,

I put the money in.'' Plaintiff Hodges in rebuttal testified that both Demetreades and Mr. Agnost had told plaintiff subsequent to the death of the decedent and prior to.the trial that they knew nothing about the $10,000 check or the money. Both witnesses denied making such statements. Plaintiff also testified that Demetreades owed the decedent money on a note.

It is true that the defendant made some conflicting and false extrajudicial statements, and that there are some peculiar, difficult-to-understand circumstances in the case. For example, why, if decedent had $10,000 in cash given him by the defendant, did it not appear in one of his bank accounts, and why on Monday morning did he have to withdraw money from the Morris Plan and other sources in order to cover the check? However, the trial judge saw the witnesses, heard them testify, observed their demeanor and believed defendant and his witnesses. As to the witnesses, in a case of this kind, it is our duty ''to examine their testimony with a jealous care and to scan it with a watchful scrutiny.''[1] Actually there is no evidence that defendant's story, somewhat peculiar though it is, is not true. Human beings do strange things and we cannot say as matter of law the defendant's claim is so fantastic or so impossible that it cannot be true.

The testimony of defendant and his wife is corroborated by the three witnesses, Demetreades, Levas and Agnost. For us to reverse the trial`court we must find as *matter of law* that not only the defendant and his wife, who of course were interested witnesses, but also the other three witnesses, committed deliberate perjury. Plaintiff testified to contradictory statements made to him by these three witnesses, which they denied. Again, it was for the trial court to determine the credibility of these witnesses.

Defendant's story—that he had held out of his bank deposits the sum of $10,000 to keep from having to report it in his income tax accounting, and that he and his wife brought it to Alameda to make a deposit on account of the purchase price of the property he expected to buy—is not so inherently improbable that we must hold that the court, who observed defendant and his wife testify, had no legal right to believe them. The same applies to the story that, finding the price of the property too high, they went on to San Francisco and, because of their drinking, felt it unsafe to keep the money

---

[1]Quotation from *Lehigh Coal & Nav. Co.* v. *Central R. R. Co.*, 41 N. J. Eq. 167 [3 A. 134] given in *Estate of Emerson*, 175 Cal. 724 at p. 728 [167 P. 149].

on their persons and gave it to their friend in exchange for his check. Especially is this so, as they were corroborated. While the fact that the decedent did not deposit the money in the bank, and the manner in which he obtained the money to meet the check are strong circumstances in favor of the assumption that decedent received no money for his check, still they are not strong enough to overcome the testimony of five witnesses whom the court believed.

The facts in *Herbert* v. *Lankershim,* 9 Cal.2d 409 [71 P.2d 220] ; *Estate of Emerson,* 175 Cal. 724 [167 P. 149] ; *Estate of Baird,* 193 Cal. 225 [223 P. 974] and *Reese* v. *Smith,* 9 Cal.2d 324 [70 P.2d 933], are so dissimilar to those in the case at bar as to make those cases not applicable here. The Lankershim case stated that testimony as to oral admissions of a decedent is the weakest of testimony unless corroborated by *satisfactory* evidence. This statement is explained in *Ferrari* v. *Mambretti,* 58 Cal.App.2d 318 at pp. 322-323 [136 P.2d 326] : ''We do not understand that the Lankershim case made a new rule in appeals involving the question of the sufficiency of the evidence . . . It is true that the court quoted with approval from an early English case holding that in proceedings of this kind the evidence of the oral admissions must be 'satisfactory' and 'convincing.' The use of these words has been frequently criticized in our decisions, and we do not understand that, in the Lankershim case, the Supreme Court was departing from the rule that the weight of the evidence, and particularly the credibility of the witnesses, were each a matter for the trial court or jury.''

There was no evidence that the decedent made a loan to defendant. Plaintiff relies entirely upon the check itself, upon decedent's method of covering the check, the fact that defendant made contradictory statements as to where he got the $10,000 to give decedent and upon plaintiff's testimony that the testimony of the corroborating witnesses was contradictory to statements which they had made to him, which statements they denied. While no California case has been cited on the subject, nor have we found any, it has been held elsewhere that the mere fact that a defendant has received a check from a plaintiff's intestate and received the money thereon does not create a presumption that the contract constituted a loan (*Faletti* v. *Child,* 204 Ill.App. 158), and that the burden of proving such a transaction to be a loan is upon the plaintiff. (*Krull* v. *Arman* (1923), 110 Neb. 70 [192 N.W. 961].) As to the contradiction between plaintiff and the cor-

roborating witnesses, the court evidently believed the latter. This, like the weight to be given all the evidence, is a matter for the trial court. " 'It is the duty of the trier of facts to reconcile, if possible, any apparent conflict, whether such conflict is developed upon the whole case or in the testimony of an individual witness, and to give effect to all the evidence, when the nature of the case will admit of such a disposition, or, if the conflict is irreconciliable, to affix their own value to the contradictory evidence. . . . It is a cardinal doctrine often enunciated, that where, upon a question of fact, the testimony in the court below involves a substantial conflict, the action of the court below will not be disturbed. It is to be presumed that the trial judge reconciled and accounted for to his own satisfaction any and all inconsistencies which might be made to appear in the testimony.' (10 Cal.Jur., pp. 1171, 1172, sec. 382, 383, citing *Adkins* v. *Brett*, 184 Cal. 252 [193 P. 251].) " (*McKean* v. *Alliance Land Co.*, 200 Cal. 396, 398-399 [253 P. 134].)

As pointed out before, while the facts are somewhat peculiar, we cannot say as matter of law that the story is inherently improbable, or that all five witnesses for the defendant committed perjury.

Plaintiff at one time in the trial of the case objected to defendant testifying as to his conversation with decedent at the Derby Café on the grounds that such testimony is inadmissible under the provisions of section 1880, subdivision 3, Code of Civil Procedure. The objection was overruled. He did not pursue his objection and has not raised the question on appeal except to contend that the testimony of defendant, when admitted, is entitled to but little weight because violative of the policy of the section. We, therefore, have not considered the effect of that section on the admissibility of the testimony. Its weight, of course, was a matter for the trial court.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.