[Civ. No. 11739.   First Dist., Div. One.   Jan. 13, 1942.]

CHARLES T. MOUL, Appellant, v. JOHN L. McVEY, as Executor, etc., Respondent.

William A. Lahanier for Appellant.

John L. McVey in pro. per. and Harry C. Morison for Respondent.

JONES (B. C.), J. pro tem.—This appeal is from a judgment entered in the trial court against the plaintiff and in favor of the defendant. The plaintiff, a physician and surgeon, filed a creditor's claim against the estate of the decedent claiming as due him for professional services rendered the decedent during her lifetime the sum of nine thousand dollars. This claim was rejected by the executor. The plaintiff thereupon instituted this action to recover on the claim and judgment went against him.

The appellant's specifications of error are directed to various adverse rulings of the trial court upon the admission of evidence. The most important of his contentions goes to his right to take the stand and testify in his own behalf after his adversary had introduced in evidence portions of testimony which he had given in previous judicial proceedings. During the progress of the trial the defendant executor produced a transcript which, as stipulated, contained the testimony of the plaintiff given in a proceeding to have a guardian appointed for the decedent in her lifetime. According to the transcript of this case, the following proceedings then ensued: "MR. McVEY: Yes. Now, if the Court please, I am reading from the testimony of Doctor Moul. MR. LAHANIER: Q. What page? MR. McVEY: 138 given on the 27th day of August, 1935, reading first from page 137, line 16: 'A. I mean that I have given Mrs. Wells a great portion of my time. Q. As her physician? A. As a physician mainly. Q. Do you think that the major part of your time is necessary to be given to Mrs. Wells, to take care of her? A. Mrs. Wells has——yes, I do. MR. GILLIS: Then he can explain. A. It is my opinion that Mrs. Wells should have every possible attention and should have a physician constantly by her or within close reach. Mrs. Wells suffers from periodic attacks of angina pectoris, some of which may be fatal to her. She has prodromes of these attacks. I can conscientiously say that when she complains of any of the prodromes—by that I mean warnings—that they are dangerous. MR. McVEY: Q. And you think it is necessary that she have a physician with her at night? A. Not all the time but a great deal of the time. Q. A great part of your time is devoted to taking

care of her, isn't it? A. It is. Q. What do you think is the reasonable value of your services that you have given to her already? A. I have not thought about it. I don't know what her income was. I gave it voluntarily and considered my services in relation to people's means. Q. What about figuring that her income is $1500.00 a month, what do you figure you would charge her estate for work you have done already, per month? A. I have recently heard that figure mentioned. I think that $4500 is a reasonable fee. Q. Well, you have been paid that, haven't you? A. No, I have not been paid. Q. You heard her testimony in the Hotel Oakland, didn't you? A. Yes, sir. Q. You heard her say she paid you $400 a month, didn't you? A. No, she has not paid me. She may have given me $400.00 on some months but the total was not paid me like that. Q. Is there any month she has not paid you money? A. Yes, lots of them, lots of months she has not. Q. Do you keep a book with her account in it? A. I have a record of it. Q. In the event that Mrs. Wells should die to-morrow, you have not—your bill has not been paid, has it? A. No, my bill has not been paid. Q. You figure right now she owes you about $4500.00? A. I have not figured it up, Mr. McVey, but I think that for the past two years I have spent the greatest part of my time with her and I should say for those two years, the greater part of my time; I have been giving up my social activities and I have spent a great deal of time outside of my office, some of it spent at her request and some taking care of her in sickness. I have lost money from it. I have had to borrow money from the Morris Plan this year. My finances have dropped considerably this year. Q. You don't know anything about putting in a bill for $250.00 a month in this matter, do you? A. Not until it had been spoken of. Q. If that was in there it would not be satisfactory to you at all? A. Not for what I have been doing for her. Q. If it is in there you don't figure that is pay for your services, do you? A. I should consider that in relation to her income and other obligations. Q. Have you ever given Mrs. Wells a bill for the work that you have done for her? A. No. Q. Have you given her a receipt for moneys paid to you? A. No. Q. So if you would put in a claim tomorrow against her estate there would not be a single paper to show what she paid you? A. I am very positive there would not.' " Another transcript was produced by the

executor containing other testimony given by the plaintiff in still another proceeding, and from the transcript on file herein the following occurrences appear: "MR. McVEY: Now, I will offer in evidence, if the Court please, testimony taken on April 8, 1940 in the Probate Department in this court in the matter of the Estate of Mary F. Wells, deceased, No. 73213, the proceeding to ascertain, concerning the property of Mary F. Wells. MR. LAHANIER: May I see it? MR. McVEY: Yes. (Handing transcript to counsel.) MR. McVEY: Doctor Charles Moul is a witness sworn and testified as follows: —(Handing papers to counsel to examine them.) MR. McVEY: It better be stipulated, Mr. Lahanier, it will be stipulated those were the purported change of beneficiaries. MR. LAHANIER: Yes. MR. McVEY: (Reading) 'Have you ever seen these papers before? They are requests to change the beneficiaries named in Mrs. Wells' insurance policies. (Handing to the witness who examines.) A. I never saw these papers before, Mr. McVey. Q. Did you ever have any conversation with Mrs. Wells about these papers? A. The only conversation I had regarding any of her annuities, Mr. McVey, was that Mrs. Wells promised to allot me an annuity in return or when my services were brought up to the amount that the annuity called for, that she would provide for me by the annuity. But that was never done, I never saw any annuity.' "

The appellant did not object to the introduction of these statements in evidence, but he took the position in the trial court, and he takes the same position here, that the introduction of his testimony, although given in another proceeding, lifted the bar of the statute prohibiting him from testifying in support of his claim against the estate. ■ The incompetency of one suing to establish a claim against the estate of a deceased person to testify against an executor or administrator as to any matter or fact occurring before the death of the decedent is declared by subd. 3 of sec. 1880 of the Code of Civil Procedure. The soundness of the rule is not open to question. (*Pearson* v. *Parsons,* 173 Cal. 331 [159 Pac. 1171]; *Estate of Emerson,* 175 Cal. 724 [167 Pac. 149].) The object of the statute is to so balance rights as between the survivor and the deceased that no advantage may be taken of a deceased person because of the fact that his lips are sealed by death, and that the personal representative may not take

advantage of the survivor. (*Cole* v. *Sweet*, 187 N. Y. 488 [80 N. E. 355].) ▉ The limitations of the statute may be waived by the personal representative by calling the survivor as a witness and going into the transaction had by him with the decedent. In so doing he waives the benefit of the statute and opens the door to the witness to testify in his own behalf fully as to the transaction gone into. (*Kinley* v. *Largent*, 187 Cal. 71 [200 Pac. 937].) ▉ Likewise the door is opened to the survivor when his deposition is taken in the action by the executor or administrator whether it is read in evidence upon the trial or not. (*McClenahan* v. *Keyes*, 188 Cal. 574 [206 Pac. 454]; *Borgess Inv. Co.* v. *Vette*, 142 Mo. 560 [44 S. W. 754, 64 Am. St. Rep. 567].)

▉▉ If the testimony given in evidence had been taken from a deposition given by the plaintiff in the case, or had been given by him from the witness stand herein, there would be no room for discussion as to his right to testify in explanation of the subject matter of his examination. No substantially different situation exists when the testimony of the survivor given in a previous proceeding is put in evidence. In either case the answers given are under compulsion of the law in response to questions propounded by counsel, and with no alternative but to answer.

The plaintiff here finds himself in that situation where a portion only of his answers were introduced in evidence. The respondent presumably selected only those portions of the previous testimony most favorable to his side of the case and presented them into evidence claiming at the same time a right to seal the lips of the survivor against any explanation of the selected statements with the bar of the statute. By offering those portions of plaintiff's previous testimony tending to support his contentions, the executor indirectly made the plaintiff his own witness and he could not at the same time invoke the cloak of the statute to shield him in his advantage. Section 1880 was not enacted for such a purpose. By thus indirectly making the plaintiff his witness, the executor opened the door for the plaintiff to testify fully in explanation of the admissions which are charged against him.

It is not the dignity with which a judicial admission is clothed, nor its competency, nor the weight to be accorded it as evidence, that lifts the bar of sec. 1880, but it is the advantage accruing to the executor or administrator by its

use that unseals the lips of the survivor. By virtue of the circumstances under which it is given, an answer to a question propounded in a judicial proceeding is limited to the scope of the question. It is not voluntary in the sense that all upon the subject may be said. On the other hand, if a survivor makes a voluntary statement upon the street concerning a transaction had by him with a decedent he has an untrammeled opportunity to add all else that he may see fit by way of explanation. He is under no compulsion to make such a statement in the first place, and, in the second place, there is nothing in the world to hinder him from explaining it to all who may hear. Of his own volition, as is held in *Stuart* v. *Lord*, 138 Cal. 672 [72 Pac. 142], he assumes the risk of having such a statement proved against him, and, if it is proved, his time for explanation has passed. It would be as manifestly unfair to permit a survivor to open the door against the limitation of his right to testify as it would be to keep it closed in the face of an advantage grasped at by an executor.

No case from this state involving the precise point raised here has been cited by counsel for either party. In other states the courts have uniformly held that the introduction in evidence of testimony previously given lifts the bar of the statute. (*Cole* v. *Sweet, supra; Cline* v. *Dexter*, 72 Neb. 619 [101 N. W. 246]; *Fox* v. *Barrett's Estate*, 117 Mich. 162 [75 N. W. 440]; *Lilley* v. *Mutual Benefit L. Ins. Co.*, 92 Mich 153 [52 N. W. 631]; *Levy* v. *Simon*, 119 Wash. 179 [205 Pac. 426].) The ruling of the trial court in not permitting the plaintiff to testify in his own behalf is a denial of a substantial right and warrants a reversal of the judgment.

The appellant specifies other rulings of the court as grounds of reversible error. These rulings in each instance involved a determination of fact by the trial judge upon the state of the record as it then stood. As the case is to go back for a new trial, and as a different state of facts may be presented upon the next trial, it is not necessary to pass upon these questioned rulings at this time.

The judgment is reversed.

Peters, P. J., and Ward, J., concurred.