[Civ. No. 23677. Second Dist., Div. One. July 9, 1959.]

GRACE CORSO, Appellant, v. SECURITY-FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association), as Executor, etc., Respondent.

Robert B. Heggen for Appellant.

Moss, Lyon & Dunn, Sydney A. Moss and Henry F. Walker for Respondent.

WHITE, P. J.—This is an action for personal injuries, allegedly caused by the negligence of decedent and his employees. The cause was tried before a jury which returned a verdict in favor of defendant executor. Plaintiff's motion for a new trial was denied. From the adverse judgment entered upon the verdict, plaintiff prosecutes this appeal. Subsequent to the commencement of this action on November 17, 1955, and on June 18, 1957, the original defendant, Walter P. Story, died, and included in his estate was a large office building in downtown Los Angeles, within which the alleged injuries sustained by plaintiff were incurred. Defendant bank was appointed executor of the estate of Mr. Story, and by subsequent order of the court below, was substituted as defendant for Walter P. Story. Plaintiff filed her verified creditor's claim with defendant bank, as said executor.

Plaintiff's "First Amendment of First Supplemental Complaint For Personal Injuries" (plaintiff's only pleading appearing in the record on appeal) reveals that for her cause of action plaintiff alleged that at all times here pertinent, the decedent, Walter P. Story, prior to his death was the owner and operator of that certain building bearing his name, and

located at 610 South Broadway, in the city of Los Angeles. That plaintiff, a licensed practitioner of physical therapy, was employed for herself and also as an independent contractor, by Dr. Fred J. Petrone, and that as an associate of the latter, plaintiff was a tenant in said building, occupying Room 809, on the eighth floor thereof. That on said eighth floor, the decedent provided washroom facilities for the tenants and their guests. That about 12:30 p.m. on January 27, 1955, plaintiff had occasion to enter the women's washroom. That in leaving said washroom, plaintiff walked therefrom, "in a reasonably careful and circumspect manner, and in the said hallway outside the door to the said women's washroom, the plaintiff slipped on water laying on the marble floor in the said hallway outside the said women's washroom, and fell to the said marble floor of the said hallway with great force and violence." That as a result thereof, plaintiff suffered very serious and permanent injuries.

It was further alleged that plaintiff's injuries were the direct result of the "carelessness and negligence of Walter P. Story, deceased and his servants and employees, . . . in that water was allowed to be and remain on the said marble floor upon which tenants and tenants' clients, associates, guests, and other persons having business therein, might walk and slip, causing great and extensive injury to themselves and their person;".

The trial of this action commenced June 24, 1958. As her first witness, plaintiff called Mary Gonzales, under section 2055 of the Code of Civil Procedure. This witness was a matron and janitress employed at the Story Building, and among her duties were included the cleaning of the men's and women's restrooms. She testified that on the day of the alleged accident she was using a pump on a stopped toilet bowl in the women's restroom on the eighth floor. The witness recalled seeing plaintiff on that occasion. That when she saw plaintiff opening the door of the restroom slowly and looking in, the witness told plaintiff not to come in but the latter "walked in pretty fast right to the next (toilet) stall." Water had overflowed "right around the bowl" where the witness was working, "but there was no water no other place but right there." The water in the stall where the witness was working extended about two inches around the base of the bowl. Mrs. Gonzales further testified that after plaintiff entered the restroom she remained in the second stall about two minutes, during which time the witness continued working as aforesaid in

the first stall. As to the conduct of plaintiff after she emerged from the second stall, Mrs. Gonzales testified:

"Q. Pardon me. What did she do after she left the second stall? A. She ran outside, out of the stall and stood by the basin and lifted her leg up and over her knee she rolled her stocking down and she said she got scratched and she pulled it up again in a hurry and walked out in a very—in a hurry, too.

"Q. Did you see her knee? A. No, I didn't.

"Q. Did you see her as she walked out? A. I did. I seen her walk out in a hurry. She got hurt in there. She fell and slipped.

"(The reporter read the answer.)

"THE WITNESS: That is what she said, she slipped and fell.

"Q. Did you hear a noise, thud or any noise as though someone had fallen? A. No. I could have seen her right from the other stall if she had fell."

When plaintiff was called as a witness in her own behalf she testified as to her occupancy of Room 809 of the Story Building, the nature and methods of her work as a physical therapist, and the location of the ladies restroom on the eighth floor. Then the following ensued:

"Q. (By Mr. Heggen, attorney for plaintiff): Now, on January 27, 1955, did you have an occasion to leave Room 809 and go to the ladies toilet?

"Mr. Moss (attorney for defendant): Now, if your Honor please, I shall object to any testimony as to matters or facts occurring before the death of the late Walter P. Story, the original defendant in this action upon the grounds that this plaintiff is not competent to testify to any such matter or fact by reason of Section 1880, subdivision 3 of the Code of Civil Procedure . . ."

"THE COURT: I will sustain the objection."

After some discussion in chambers outside the presence of the jury, concerning the foregoing ruling and the refusal of the trial judge to reverse it, plaintiff's counsel offered in evidence the deposition of plaintiff taken on March 7, 1956, with the request that he be permitted to read the same to the jury, to which defendant interposed an objection upon the grounds ". . . first, that the testimony of the plaintiff herself has been held to be barred by Section 1880, subdivision 3 of the Code of Civil Procedure, and if the testimony of the witness herself is not admissible then certainly a deposition of this same witness would not be admissible, and that, furthermore, I submit that

it, too, is barred by Section 1880, subdvision 3 of the Code of Civil Procedure. . . .'' The objection was overruled and plaintiff's deposition was read to the jury. Plaintiff then resumed the witness stand and testified, over defendant's objection, to matters and facts occurring subsequent to the death of Mr. Story, concerning the nature of her injuries.

Plaintiff also produced Ann O'Brien who testified concerning her observations as to plaintiff's condition after the latter returned to the office. This witness was also a physical therapist and worked in the same office as did plaintiff. She testified she was in the office when plaintiff returned from the restroom on the day here in question. That plaintiff was limping and ''Her ankle looked like it was red, looked like there might be blood under the surface of the skin, like a broken vein. It was a bruise, red and her knee, on the side of her knee as I looked at it was red and she had a bump on the side of her head by the temple.'' That plaintiff ''. . . was sitting down holding her head. That is how I first noticed there was a lump on the head. Then I observed the rest of her ankle and her knee where she had fallen on the left side and she looked like she was in a daze, like she had been hurt.'' That plaintiff was in a dazed condition, and appeared to be in pain. The witness further testified that about 45 minutes after plaintiff's return to the office from the restroom, the witness went down the hall to obtain a drink of water; that in so doing she passed by the ladies' restroom, and, ''I noticed marks like there had been water and someone—the way I explain it, it was like mud, dried or—or like water, foot steps, several of them and then a streak like a skid.'' . . . ''Well, to explain it, it was just like if you walked on some water and then stepped onto something and then made marks. That is the best way I could describe it because I didn't—Then there was skid marks. It could have been several foot prints. It might have been. It was blotchy like you could see—I noticed—— . . . They were all together like in this area.'' That there was a ''damp'' spot on plaintiff's uniform; that plaintiff was wearing a ''nurse's shoe'' with a rubber sole. On cross-examination the witness was asked, ''My question is, did you see anything wet on the floor when you went out there 45 minutes later?'' to which she replied, ''Well, I couldn't say one way or another.''

We have set out in some detail the testimony of the last witness because plaintiff's counsel urges that she ''was confused and vague in her testimony . . . was not sure whether she saw water in the hall or not, and exactly where,'' all of

which added to the prejudice sustained by plaintiff when she was denied the right to testify as to the conditions prevailing in the restroom and on the hallway floor when plaintiff allegedly slipped and fell.

Because of the importance it will assume in the consideration of the legal problems presented on this appeal, we deem it advisable to briefly summarize plaintiff's deposition which was received in evidence and read to the jury. Plaintiff testified therein that on January 27, 1955, about 11:30 or 12 o'clock, she went to the women's restroom. She had used the restroom on previous days but this was the first time on this date. The hallway floors were marble. In approaching the restroom, she did not look down and did not notice any water or foreign substance on the floor. In entering the restroom itself, she first felt water when first she stepped her foot in. She did not lose her balance. She went on in and used the facilities. The matron came in; in fact she was standing at the doorway with mop in hand and she opened the door for plaintiff. Both of them walked right into the water. There was water on the restroom floor, mostly in front and in the first booth. It was clear water. Plaintiff went into the second stall. She was inside the restroom door when she first noticed water. As she left, she went to the door to the hall, opened it, and next found herself sailing through the air and down on the floor. When she was leaving the matron was in the first stall with the stall door open. The hall door was closed. It opened to the inside. She had put her first foot down on the outside of the door when she fell. The inside was damp from being mopped but it was not flooded. Her first step outside on the marble was when she fell. She does not recall again seeing water on outside as she started out. It was on her first step that she fell. She did not remember looking at the floor outside. She remembers that she did not look at the floor outside the restroom as she walked out. As she went out the door, she was not looking at anything—just to open the door and walk back to the office. She remembers skidding and that she lit on her left side. Her uniform was wet on the left side. She did not notice any water around her as she lay on the floor. She got up and went back into the restroom to tell the matron that she had fallen. She did not know whether the matron heard her or not as the matron made no reply. Plaintiff went back to her office. She saw no one until she went back into her office. After plaintiff got up, she did not observe the condition of the floor nor did she on her way back to her office.

She was stunned but had no difficulty as far as the condi-, tion of the floor was concerned in walking over the floor outside the restroom this time. She told the manager of the building about it the next day. (Plaintiff then deposed about her injuries.) As she went into the restroom, she first noticed any water when she was standing in it with both feet. There was nothing on the outside that she could notice because the matron was standing there with the mop and she opened the door and plaintiff followed her in. Plaintiff went inside the door and there first noticed the water.

"Q. You did not at any time see any water outside the door, as far as you remember?

"A. As far as I remember, I didn't see because I didn't look down.

"Q. But you don't remember standing in any water outside the door, either?

"A. No, I don't."

She was inside the door when she first noticed she was standing in water. She did not look back around to the outside then. When she came out of the stall, she noticed the matron had mopped between the first stall and the door to the hall but the area was still damp. There was quite a bit of water toward the wall of the first booth. Plaintiff did not go in that area; only through or in the area that was still quite damp. Then she went out of the restroom door and on her first step felt herself flying through the air. She did not at any time see any water or other foreign substance in the area where her body landed or where her foot was or where her foot was when it went out from under her. Her uniform was damp but not dripping—not enough water to wring out. She did not change her uniform that day when she went back to the office but kept on the same uniform (except during the period she received some ultrasonic treatment) to finish the day.

"Q. . . . (A)s I understand it, you did not at any time see any water outside the restroom door as such?

"A. I didn't look down. That's right.

"Q. You did not see any or notice any, or notice you were standing in any water?

"A. That's right."

 As her first ground for reversal of the judgment appellant earnestly urges that the trial court erred in denying her the right to testify, as to how the injury occurred for the reasons set forth in subdivision 3 of section 1880 of the Code

of Civil Procedure, which denies a party the right to testify upon a claim or demand against the estate of a deceased person, ''as to any matter of fact occurring before the death of such deceased person.'' Appellant urges that the cases which construe this code section concern situations in which both the plaintiff and the decedent took an active personal part in the transaction involved, be it a contract or a tort. That the obvious object of the statute is to ''prevent the plaintiff from having an unfair advantage against a dead man's estate.''

Appellant further argues that the instant action does not parallel any case that can be found in that herein the deceased defendant Story knew nothing of the facts of this case except what was reported to him, and therefore, there is no testimony that could have been given by decedent Story were he living, that could have refuted that which would be given by appellant as to the immediate circumstances surrounding the happenings which occasioned appellant's alleged injuries.

In the recent case of *Trabin* v. *Title Ins. & Trust Co.,* 52 Cal.2d 149, 152 [339 P.2d 136], our Supreme Court thus epitomizes the historical background surrounding the statute here in question:

''At early common law witnesses having a direct pecuniary or proprietary interest in the outcome of a case were disqualified on the theory that permitting them to testify would often lead to perjury which would go undetected and that more injustice would result from receiving their testimony than from excluding it. In the nineteenth century this general disqualification was recognized to be unsound and was abolished by legislative reform. However, in this country, unlike England, an exception was made, and the common law rule was to varying extents kept in force with respect to cases involving the estates of deceased persons by statutes like subdivision 3 of section 1880. The exception was apparently based on the view that, because the lips of a decedent were sealed, there was too great a danger that interested survivors would take advantage of his estate. (For historical discussion see 2 Wigmore on Evidence (3d ed., 1940), pp. 674, 695-701; Chadbourn, *History and Interpretation of the California Dead Man Statute: A Proposal for Liberalization,* 4 U.C.L.A. L.Rev. 175.) Writers in the field of evidence have vigorously attacked such legislation, reasoning in substance that it represents an anomalous retention of a discredited common law doctrine and is productive of injustice at least as great as, and more concrete than, the evil sought to be prevented.

(See 2 Wigmore on Evidence (3d ed., 1940), pp. 695-701; McCormick on Evidence, pp. 142-144; Chadbourn, *History and Interpretation of the California Dead Man Statute: A Proposal for Liberalization,* 4 U.C.L.A. L.Rev. 175, 206 et seq.; Hale, *The California 'Dead Man's Statute,'* 9 So.Cal.L.Rev. 35, 43 et seq.)''

▉ The court then goes on to say: ''This court has been reluctant to extend the effect of subdivision 3 of section 1880 beyond what is compelled by its language and in many cases has narrowly construed the statute against the disqualification of a witness and in favor of the admissibility of evidence. (Citing cases.)''

The question then arises whether a witness in the position of appellant, is disqualified as a witness, upon any sound basis when subdivision 3 of section 1880, Code of Civil Procedure, is considered in the light of its background and purpose.

▉ As stated in *Moul* v. *McVey,* 49 Cal.App.2d 101, 105 [121 P.2d 83] : ''The object of the statute is to so balance rights as between the survivor and the deceased that no advantage may be taken of a deceased person because of the fact that his lips are sealed by death, and that the personal representative may not take advantage of the survivor.''

Appellant relies upon the case of *Sweet* v. *Markwart,* 158 Cal.App.2d 700 [323 P.2d 192], which was an action wherein decedent died after the commencement thereof, but prior to trial. Pending suit and prior to his death, decedent's deposition had been taken. After death of defendant, an executor of his estate was appointed. The holding was that the decedent's deposition could be used by plaintiff against the estate. It was further held that, as to matters which decedent had made denial in his deposition, i.e., concerning which he had testified, the plaintiff would be competent to testify. In the case just cited, the court, at page 711, quoting from *Coble* v. *McClintock,* 10 Ind.App. 562 [38 N.E. 74], stated, '' 'We think, when it is made to appear that the decedent has testified in a manner known to the law, and that his testimony is available to his estate, the reason for closing the mouth of the living party has ceased to exist, and when the reason ceases the rule should cease also.' (See also annotation, 158 A.L.R. 306.) Under such circumstances there is no advantage to the adverse party by permitting him to testify against the estate as to matters denied by the decedent because the denial of the decedent is available to the estate.'' Appellant also cites the

case of *Moul* v. *McVey, supra,* page 106, holding that when the deposition of the survivor is *taken by the executor or administrator,* whether it is read in evidence upon the trial or not, opens the door for the survivor to testify. In the instant case appellant's deposition was not taken by the executor, but during the lifetime of decedent Story. Also cited is *McKee* v. *Lynch,* 40 Cal.App.2d 216, 227 [104 P.2d 675], relied upon by the trial court in admitting into evidence appellant's deposition.

Based upon the foregoing cases, appellant urges that they emphasize the provisions of Civil Code, section 3510, "When the reason of a rule ceases, so would the rule itself."

Appellant correctly states that there is in the record the following testimony of Mary Gonzales, the matron and janitress at the Story Building:

"Q. Did you know Mr. Story? A. Yes, sir.

"Q. Did he ever give you any direct instructions himself? A. No.

"Q. Was he present on this occasion on January 27, 1955, as far as you know? A. No." and the testimony of appellant as given in her deposition as follows:

"Q. Did you see anyone else from the time that you fell until you went back in your office? A. No.

"Q. Other than the matron? A. I did not see anyone."

It is appellant's contention that since it was established that decedent Story was not present at the time of the accident, knew nothing of it, that, if alive at the time of trial, he could give no testimony in refutation of appellant's version of how the accident occurred. Therefore, says appellant, ". . . the reason for closing the mouth of the living party has ceased to exist and when the reason ceases the rule should cease also." But to sustain appellant's argument and reasoning in support thereof we would be required to overrule the holding in *Stuart* v. *Lord,* 138 Cal. 672, 676, 677 [72 P. 142]. This was an action to recover for services rendered to a decedent during his lifetime. Testifying as a witness for the administrator of decedent's estate, a Mrs. Baun related a conversation which she had with plaintiff outside the presence of decedent, wherein plaintiff stated to the witness that the former was "receiving . . . the sum of fifteen dollars per month, and the profits for the sale of butter and eggs, which were produced on the ranch" which compensation was considerably lower than the amount plaintiff claimed per month

for the services by her law suit. Plaintiff sought to take the stand and refute by her testimony the making of such a statement. The trial court ruled that she could not do so in the face of objection predicated on the statute here in question.

In holding that the trial court did not err in sustaining the objection to this testimony, the Supreme Court stated (pp. 676, 677):

". . . It cannot be said that the testimony here offered would not tend to establish the plaintiffs' claim or demand. An admission of the plaintiff, against her interest, and in contradiction of an important allegation of the complaint upon which issue was joined, namely, the value of her services, is clearly evidence tending to defeat a large part of the asserted claim, reducing it in this case from eight hundred and forty dollars to three hundred and sixty dollars. The evidence having been given it appears to be equally clear that the plaintiff's testimony to the effect that she did not make the admissions, would tend directly to establish so much of her claim as the other testimony tends to defeat. Such testimony cannot be said to arise incidentally, any more than any other evidence directly upon the issues. It certainly comes within the very terms of the statutory provision. Neither can it be said that the spirit or object of the statute justified a departure from its letter. It is true that it may be a hardship upon the plaintiff to be prevented by the law from contradicting the testimony of third persons as to admissions *not made in the presence of the deceased,* but, on the other hand, it can be said with equal force, that it is a hardship on the estate that the deceased is prevented by death from denying any admissions against his interest which witnesses for the plaintiff may testify were made by him in his lifetime. The manifest object and purpose of the statute is to put them on an equal footing in respect to such evidence. And, besides, *there is nothing in the statute to indicate that its effect was intended to be limited to things which occurred in the presence of the deceased.* The language is: 'Any matter or fact occurring before the death of the deceased,' and *this applies as well to things occurring without his presence as to those in which he may have participated. . . .*" (Emphasis added.)

Manifestly, in the case now engaging our attention appellant sought to testify to matters of fact which occurred before the death of decedent Story and this is what the statute forbids, and it is applicable as well, as stated in *Stuart* v. *Lord,*

*supra,* page 677, ''. . . to things occurring without his (decedent's) presence as to those in which he may have participated.'' (See also *Vonchina* v. *Estate of Turner,* 154 Cal.App. 2d 134, 136, 137 [315 P.2d 723].)

While it is true as urged by appellant that if she ''. . . had called Mr. Story on a deposition before he died, and had asked him if he was present on the eighth floor of his building on January 27, 1955, between 12:00 and 1:00 P.M., and he said, 'No,' then under the *Sweet* case (*Sweet* v. *Markwart, supra*), plaintiff could testify in person. Because of the technicality of not having gone through this procedure, plaintiff now cannot testify,'' but this modification in favor of the admissibility of evidence is predicated, as stated in the Sweet case, on the premise, as therein stated, that when, ''the decedent has testified in a manner known to the law, and that his testimony is available to his estate, the reason for closing the mouth of the living party has ceased to exist, and when the reason ceases the rule should cease also.'' No such situation exists here. While through the years various changes have been made by the Legislature in the probate code with regard to an action against the executor upon a claim or demand against the estate, it is noteworthy that notwithstanding these changes, no amendment has been made to section 1880, subdivision 3, and this would strongly indicate that the Legislature has not intended to change the expressed meaning of that statute as interpreted by the courts.

The foregoing conclusion at which we have arrived, and since the judgment was in favor of respondent, renders it unnecessary to consider the latter's contention that the court erred in permitting appellant's deposition to be read into evidence over respondent's objection. Suffice it to say that upon the authority of and for the reasons stated in *McKee* v. *Lynch, supra,* pp. 226, 227 (hearing denied by the Supreme Court), the ruling of the trial court was correct.

■ We are not in accord with respondent's contention that since appellant's deposition was read into evidence, she cannot be heard to complain of the action of the trial judge in applying the provisions of the Code of Civil Procedure, section 1880, subdivision 3, because she was not prejudiced in that, ''In her deposition, appellant described fully what occurred, just what she did observe, and what was not observed.'' As stated by appellant, ''The deposition was used as only the next best thing and not as the most desirable evidence''; that she was entitled to ''an opportunity to elaborate upon, and give

in more detail, evidence concerning matters touched upon in her deposition, which was by way of answer to defendant's questions, on Code of Civil Procedure, section 2055." We have herein set forth in some detail the contents of appellant's deposition, and from a reading thereof, we are satisfied that had the court erred in applying the restrictions of Code of Civil Procedure, section 1880, subdivision 3, to appellant's testimony it could not reasonably be urged that the judgment should be affirmed because no prejudice ensued to appellant from such ruling.

■ Finally, appellant urges that if Code of Civil Procedure, section 1880, subdivision 3, prohibits her from testifying under the facts of this case, it is unconstitutional as applied thereto, and offends against the Constitution of California, article I, section 13, and the due process clause of the United States Constitution as contained in the Fourteenth Amendment thereto. Appellant states that, "No cases have been found either in California, or other jurisdictions, giving specific application of this principle to the same or similar type of case as this." However, appellant argues that these constitutional provisions require a "fair hearing," and that the restriction placed upon appellant's testimony herein denied her equal protection under the law to present "vital evidence" to the jury.

We are satisfied that appellant's claim of unconstitutionality of the statute in question cannot be sustained.

■ In 11 California Jurisprudence 2d, Constitutional Law, section 219, page 633, it is stated: "Again, the right to testify in the courts of the state is not a privilege or immunity protected by the Fourteenth Amendment, and the state legislature has the power to declare who shall be competent to testify, and to regulate the production of evidence in the state courts." And in 16 Corpus Juris Secundum, Constitutional Law, section 128, page 532, we find the following: "The legislature has the right to control the general competency of witnesses and the subjects of their testimony; but a court cannot be empowered to make a party a competent witness contrary to the general law." In *Vonshina* v. *Estate of Turner, supra,* page 136, the court said that the "statute is supported by sound public policy and was wisely adopted in the interests of justice."

Pertinent to appellant's challenge to the constitutionality of subdivision 3 of section 1880 of the Code of Civil Procedure,

is the language of the court in *Fleming* v. *Superior Court*, **196** Cal. 344, 351 [238 P. 88], ''As well might it be contended that section 13 of article I is violated by section 1881 of the Code of Civil Procedure, which provides that husband and wife may not testify against each other, that an attorney may not testify against his client, that a priest may not as a witness betray the secrets of the confessional, that a physician may not testify against his patient, and that a public officer may not be examined as to communications made to him in official confidence, for a prohibition against all such persons testifying *against* certain parties includes, necessarily, a prohibition against their testifying *in favor* of those opposed to such parties. The same might be said as to other enactments which make various kinds of 'natural' evidence incompetent. Practically all rules of evidence are exclusionary (Jones Ev., § 1), and it has never been doubted that the legislature has power to declare certain 'natural' evidence inadmissible, or to declare certain persons incompetent as witnesses, either on grounds of public policy, or for the purpose of conducing to the despatch of business in the courts.''

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 31, 1959. White, J., did not participate therein.